ROBERT C. SCHLEIN
California State Bar No. 97876
401 "B" Street, Suite 2209
San Diego, CA 92101
Telephone: (619) 235-9026
Email: robert@rcslaw.org

*Attorney for Jaime Meza-Cervantes*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HONORABLE THOMAS J. WHELAN)

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case: 08CR1356-W |
| Plaintiff, | Date: June 16, 2008<br>Time: 2:00 p.m. |
| v. | STATEMENT OF FACTS AND |
| JAIME MEZA-CERVANTES, | MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT OF |
| Defendant. | DEFENDANT'S MOTIONS |

TO:     KAREN P. HEWITT, UNITED STATES ATTORNEY, and
        DALE BLANKENSHIP, ASSISTANT UNITED STATES ATTORNEY

I.

STATEMENT OF FACTS

The following statement of facts is based, in part, on materials received from the government. The facts alleged in these motions are subject to amplification and/or modification at the time these motions are heard. The Defendant is named in a single count information, dated April 9, 2007, alleging attempted entry after deportation as follows:

**Count 1**

"On or about January 6, 2008, within the Southern District of California, defendant JAIME MEZA-CERVANTES, an alien, knowingly and intentionally attempted to enter the United States of America with the purpose, i.e., conscious desire, to enter the United States without the express consent of the Attorney General of the United States or his designated successor, the Secretary of the Department of Homeland Security, after having been previously excluded, deported and removed from

Memorandum of Points and Authorities in Support of Defendant's Motions to Compel Discovery, Allow Defendant to Present a Necessity Defense and Grant Leave to File Further Motions

1

1  the United States to Mexico, and not having obtained said express consent to reapply for admission
2  thereto; and committed an overt act to wit, crossing the border from Mexico in the United States, that
3  was a substantial step towards committing the offense, all in violation of Title 8, United States Code,
4  Section 1326(a) and (b). "

5        What the government's complaint fails to mention is that Mr. Meza-Cervantes only
6  attempted to enter the United States of America on January 6, 2008, out of necessity to avoid serious
7  bodily injury or death.  Mr. Meza-Cervantes was attacked on January 6, 2008, near the San Ysidro port
8  of entry by criminal elements in Tijuana, Mexico, whose identity has yet to be determined.  In fact, the
9  Defendant was followed into the actual port of entry by his assailants, who were also arrested by the
10 U.S. Border Patrol.  Mr. Meza-Cervantes was in grave danger in Mexico, because he was being pursued
11 and attacked by members of a criminal gang and could not seek protection from the police, because
12 corrupt members of the police were co-operating with the criminal gang in an effort to kill Mr. Meza-
13 Cervantes.   Under threat of injury or death by a criminal gang, and the Tijuana police, Mr. Meza-
14 Cervantes had no choice but to seek refuge in the United States of America.  In fact, the day after Mr.
15 Meza-Cervantes was detained at the border, the U.S. Border Patrol offered him the option of being
16 immediately deported back to Mexico, but instead the Defendant opted to risk prosecution and stay in
17 custody so that he could present his case for asylum to an immigration judge.

18       Mr. Meza-Cervantes believes that the people trying to harm him are either members of,
19 or are being paid by the "Southside" gang.  In his youth, Mr. Meza-Cervantes was a member of the
20 "Southsiders" and was influenced by other gang members to commit crimes.  In 1997, Mr. Meza-
21 Cervantes was involved in a gang-related shooting that resulted in the death of another gang member.
22 He was prosecuted for his involvement, convicted of voluntary manslaughter and sentenced to nine
23 years in prison.  While in prison, Mr. Meza-Cervantes was ordered to commit a murder by his gang, but
24 refused because he was trying to turn his life around.  For this refusal, Mr. Meza-Cervantes was expelled
25 from the gang, and a "hit" was put on him for his refusal to follow orders.  Even after his deportation,
26 members of his former gang continued to pursue Mr. Meza-Cervantes in Mexico, ostensibly with the
27 intent to kill him for quitting the "Southsiders" gang.
28

II.

MOTION TO COMPEL DISCOVERY

Defendant moves for the production by the government of the following discovery and for the preservation of evidence. This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any government agency. See generally Kyles v. Whitley, 514 U.S. 419 (1995); United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

(1) The Defendant's Statements. The Government must disclose to the defendant all copies of any written or recorded statements made by the defendant; the substance of any statements made by the defendant which the Government intends to offer in evidence at trial; any response by the defendant to interrogation; the substance of any oral statements which the Government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the Government agent; any response to any Miranda warnings which may have been given to the defendant; as well as any other statements by the defendant. Fed. R. Crim. P. 16(a)(1)(A) and (B). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements. In particular, the defense requests any and all statements pertaining to Mr. Meza-Cervantes' refusal to be deported immediately after his arrest.

(2) Arrest Reports, Notes and Dispatch Tapes. The defense also specifically requests that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances surrounding his arrest or any questioning, if such reports have not already been produced in their entirety, be turned over. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and (B) and Brady v. Maryland, 373 U.S. 83 (1963). See also Loux v. United States, 389 F.2d 911 (9th Cir. 1968). Arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports

1  pertaining to the defendant are available under Fed. R. Crim. P. 16(a)(1)(B), Fed. R. Crim. P. 26.2, and
2  Fed. R. Crim. P. 12(h). Preservation of rough notes is requested, whether or not the government deems
3  them discoverable.

4      (3) <u>Brady Material</u>. Defendant requests all documents, statements, agents' reports, and
5  tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of
6  the government's case. Under <u>Brady</u>, impeachment as well as exculpatory evidence falls within the
7  definition of evidence favorable to the accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United
8  States v. Agurs</u>, 427 U.S. 97 (1976).

9      (4) <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>. As
10  discussed above, this information is discoverable under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). This
11  request includes any cooperation or attempted cooperation by the defendant, as well as any information
12  that could affect any base offense level or specific offense characteristic under Chapter Two of the
13  Guidelines. Also included in this request is any information relevant to a Chapter Three adjustment, to a
14  determination of the defendant's criminal history, or to any other application of the Guidelines.

15      (5) <u>Any Information That May Result in a Lower Sentence Under 18 U.S.C. § 3553</u>.
16  After *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), the Guidelines are merely advisory
17  and federal sentencing is governed by 18 U.S.C. § 3553, which requires a judge to consider "any
18  information about the nature of the circumstances of the offense." 18 U.S.C. § 3553(a)(1). This broad
19  range of judicial discretion, combined with the mandate that "[n]o limitation shall be placed on the
20  information concerning the background, character, and conduct of a person convicted of an offense
21  which a court of the United States may receive and consider for the purpose of imposing an appropriate
22  sentence," 18 U.S.C. § 3661, means that any information whatsoever may be "material … to
23  punishment," <u>Brady</u>, 373 U.S. at 87, whether or not the government deems it discoverable. The
24  defense requests any evidence of other Mexican nationals pursuing Mr. Meza-Cervantes into the San
25  Ysidro Port of Entry, including reports, video or audio recordings, and officer statements.

26      (6) <u>The Defendant's Prior Record</u>. Evidence of prior record is available under Fed. R.
27  Crim. P. 16(a)(1)(D). Counsel specifically requests that the copy be complete and legible.
28

1       (7) <u>Any Proposed 404(b) Evidence</u>.  Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(E) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial.  The defendant requests that such notice be given three weeks before trial in order to give the defense time to adequately investigate and prepare for trial.

      (8) <u>Evidence Seized</u>. Evidence seized as a result of any search, either warrantless or with a warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(E).

      (9) <u>Request for Preservation of Evidence</u>.  The defense specifically requests that all dispatch tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case be preserved.  This request includes, but is not limited to, the results of any fingerprint analysis, alleged narcotics, the defendant's personal effects, the vehicle, and any other evidence seized from the defendant, or any third party.  It is requested that the government be ordered to <u>question</u> all the agencies and individuals involved in the prosecution and investigation of this case to determine if such evidence exists, and if it does exist, to inform those parties to preserve any such evidence.

      (10) <u>Tangible Objects</u>.  The defense requests, under Fed. R. Crim. P. 16(a)(1)(E) the opportunity to inspect and copy as well as test, if necessary, all other documents and tangible objects, including photographs, books, papers, documents, photographs of buildings or places or copies of portions thereof which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to the defendant.

      (11) <u>Evidence of Bias or Motive to Lie</u>.  The defense requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or her testimony.  <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 (1987); <u>United States v. Strifler</u>, 851 F.2d 1197 (9th Cir. 1988).

      (12) <u>Impeachment evidence</u>.  Defendant requests any evidence that any prospective government witness has engaged in any criminal act whether or not resulting in a conviction and

Memorandum of Points and Authorities in Support of Defendant's Motions to Compel Discovery, Allow Defendant to Present a Necessity Defense and Grant Leave to File Further Motions

5

1  whether any witness has made a statement favorable to the defendant.  See Fed. R. Evid. 608, 609 and
2  613.  Such evidence is discoverable under Brady v. Maryland.  See United States v. Strifler, 851 F.2d
3  1197 (9th Cir. 1988) (witness' prior record); Thomas v. United States, 343 F.2d 49 (9th Cir. 1965)
4  (evidence that detracts from a witness' credibility).
5          (13) Evidence of Criminal Investigation of Any Government Witness. The defense
6  requests any evidence that any prospective witness is under investigation by federal, state or local
7  authorities for any criminal conduct.  United States v. Chitty, 760 F.2d 425 (2d Cir. 1985).
8          (14) Evidence Affecting Perception, Recollection, Ability to Communicate.  Defendant
9  requests any evidence, including any medical or psychiatric report or evaluation, tending to show that
10 any prospective witness's ability to perceive, remember, communicate, or tell the truth is impaired; and
11 any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an
12 alcoholic.  United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988); Chavis v. North Carolina, 637 F.2d
13 213, 224 (4th Cir. 1980).
14         (15) Witness Addresses.  The defense requests the name and last known address of each
15 prospective government witness.  See United States v. Napue, 834 F.2d 1311 (7th Cir. 1987); United
16 States v. Tucker, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is
17 ineffective); United States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979), overruled on other grounds by
18 Luce v. United States, 469 U.S. 38 (1984) (defense has equal right to talk to witnesses).  The defendant
19 also requests the name and last known address of every witness to the crime or crimes charged (or any
20 of the overt acts committed in furtherance thereof) who will not be called as a government witness.
21 United States v. Cadet, 727 F.2d 1453 (9th Cir. 1984).
22         (16) Name of Witnesses Favorable to the Defendant. The defense requests the name of
23 any witness who made any arguably favorable statement concerning the defendant or who could not
24 identify him or who was unsure of his identity, or participation in the crime charged.  Particullarly,
25 defense requests the name and contact information for the U.S. Border Patrol agent who initially
26 screened Mr. Meza-Cervantes at the San Ysidro Port of Entry.  Jackson v. Wainwright, 390 F.2d 288
27 (5th Cir. 1968); Chavis v. North Carolina, 637 F.2d 213, 223 (4th Cir. 1980); Jones v. Jago, 575 F.2d
28

1  1164, 1168 (6th Cir. 1978); Hudson v. Blackburn, 601 F.2d 785 (5th Cir. 1979).

2  (17) Statements Relevant to the Defense. The defense requests disclosure of any
3  statement that may be "relevant to any possible defense or contention" that he might assert. United
4  States v. Bailleaux, 685 F.2d 1105 (9th Cir. 1982). This would include Grand Jury transcripts which are
5  relevant to the defense motion to dismiss the indictment. Defense requests a copy of any statement
6  made by the Defendant to the government pertaining to his fear of remaining or being returned to
7  Mexico.

8  (18) Jencks Act Material. The defense requests all material to which defendant is
9  entitled pursuant to the Jencks Act, 18 U.S.C. § 3500, reasonably in advance of trial, including dispatch
10  tapes. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness'
11  interview is sufficient for the report or notes to qualify as a statement under § 3500(e)(1). Campbell v.
12  United States, 373 U.S. 487, 490-92 (1963).

13  (19) Giglio Information. Pursuant to Giglio v. United States, 405 U.S. 150 (1972), the
14  defendant requests all statements and/or promises, expressed or implied, made to any government
15  witnesses, in exchange for their testimony in this case, and all other information which could arguably
16  be used for the impeachment of any government witnesses.

17  (20) Reports of Scientific Tests or Examinations. Pursuant to Fed. R. Crim. P.
18  16(a)(1)(F), the defendant requests the reports of all tests and examinations conducted upon the
19  evidence in this case. Including, but not limited to, any fingerprint testing done upon any evidence
20  seized in this case, that is within the possession, custody, or control of the government, the existence of
21  which is known, or by the exercise of due diligence may become known, to the attorney for the
22  government, and which are material to the preparation of the defense or are intended for use by the
23  government as evidence in chief at the trial.

24  (21) Henthorn Material. The defendant requests that the prosecutor review the
25  personnel files of the officers involved in his arrest, and those who will testify, and produce to him any
26  exculpatory information at least two weeks prior to trial and one week prior to the motion hearing. This
27  includes all citizen complaints and other related internal affairs documents involving any of the
28

1  immigration officers or other law enforcement officers who were involved in the investigation, arrest
2  and interrogation of defendant. See United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991). In addition,
3  he requests that if the government is uncertain whether certain information is to be turned over pursuant
4  to this request, that it produce such information to the Court in advance of the trial and the motion
5  hearing for an in camera inspection.

6        (22) Informants and Cooperating Witnesses. The defense requests disclosure of the
7  names and addresses of any informants or cooperating witnesses used or to be used in this case. The
8  government must disclose the informant's identity and location, as well as disclose the existence of any
9  other percipient witness unknown or unknowable to the defense. Roviaro v. United States, 353 U.S. 53,
10 61-62 (1957). The defense also requests disclosure of any information indicating bias on the part of any
11 informant or cooperating witness. Giglio v. United States, 405 U.S. 150 (1972). Such information
12 would include what, if any, inducements, favors, payments, or threats were made to the witness to
13 secure cooperation with the authorities.

14       (23) Expert Witnesses. Pursuant to Fed. R. Crim. P. 16(a)(1)(G), the defendant requests
15 a written summary of the expert testimony that the government intends to use at trial, including a
16 description of the witnesses' opinions, the bases and the reasons for those opinions, and the witnesses'
17 qualifications.

18       (24) Residual Request. The defense intends by this discovery motion to invoke his
19 rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the
20 Constitution and laws of the United States. This request specifically includes all subsections of Rule 16.
21 Defendant requests that the government provide him and his attorney with the above requested material
22 sufficiently in advance of trial.

23       II.
24 MOTION TO ALLOW MR. MEZA-CERVANTES TO PRESENT A NECESSITY DEFENSE
25       Mr. Meza-Cervantes requests that this Court allow him to present a necessity defense.
26 The defense of necessity is available to a defendant who has "committed a particular offense to prevent
27 an imminent harm which no available option could similarly prevent." United States v. Arellano-Rivera,
28

Memorandum of Points and Authorities in Support of Defendant's Motions to Compel Discovery, Allow Defendant to Present a Necessity Defense and Grant Leave to File Further Motions
8


244 F.3d 1119, 1125 (9th Cir. 2001). The necessity defense is designed to spare a person from punishment if that person reasonably believed that the criminal action taken "was necessary to avoid a harm more serious than sought to be prevented by the statute defining the offense." United States v. Bailey, 444 U.S. 394, 410 (1980).

The Ninth Circuit has described necessity as "essentially" "a utilitarian defense... It therefore justifies criminal acts taken to avert a greater harm, maximizing social welfare by allowing a crime to be committed where the social benefits of the crime outweigh the social costs of failing to commit the crime." United States v. Schoon, 971 F.2d 193, 196 (9th Cir. 1992). An offer of proof is sufficient to support a necessity defense if it permits a reasonable jury to conclude:

(1) That Mr. Meza-Cervantes was faced with a choice of evils and chose the lesser evil;

(2) That he acted to prevent imminent harm;

(3) That he reasonably anticipated a causal relation between his conduct and the harm to be avoided; and

(4) That there were no other legal alternatives to violating the law.

Arellano-Rivera, 244 F.3d at 1126.

**A.     Mr. Meza-Cervantes Chose the Lesser of Two Evils By Entering the United States in Order to Save His Own Life.**

Mr. Meza-Cervantes had a choice, attempt to enter the United States illegally or die, and he chose the lesser of the two evils. Arellano-Rivera, 244 F.3d at 1126. On January 6, 2008, Mr. Meza-Cervantes was being pursued by thugs who intended on severely hurting or killing him. Just minutes prior to his attempted entry, Mr. Meza-Cervantes was shot at with a firearm in Tijuana by the individuals who were pursuing him. Mr. Meza-Cervantes believed that if he did no enter the United States, he would be killed. Thus, Mr. Meza-Cervantes was faced with the choice of dying or entering the United States without permission.

Entering the United States was the lesser of two evils. The harm created by his entering the country illegally is minimal. Section 1326 is "a regulatory statute enacted to assist in the control of

unlawful immigration by aliens. This offense is a typical *mala prohibita* offense..." <u>United States v. Pena-Cabanillas</u>, 394 F.2d 785, 788-89 (9th Cir. 1968); <u>see also</u> Black's Law Dictionary, p. 971 (7th Ed. 1999) ("An offense *malum prohibitum* is not a wrong which is prohibited, but something which is wrong only in the sense that it is against the law."). Thus, because saving a human life is more important than a violation of a regulatory offense, Mr. Meza-Cervantes' action of entering the United States was the lesser of two evils.

**B.     Mr. Meza-Cervantes Entered the United States In Order to Prevent Imminent Death or Serious Bodily Injury.**

Mr. Meza-Cervantes entered the United States in order to prevent imminent harm. <u>See</u> <u>Arellano-Rivera</u>, 244 F. 3d at 1126. Here, Mr. Meza-Cervantes believed that, if he did not immediately escape the persecution of criminal gangs and the police in Tijuana, Mexico, he would die. This belief was affirmed by Asylum Officers Wolf Coker and Mark Farfaglia, who issued a credible fear report on January 16, 2008, stating that in Mr. Meza-Cervantes' case, "There is a significant possibility that the assertions underlying the applicant's claim could be found credible in a full asylum or withholding of removal hearing," and that the "Credible fear of torture [was] established." *See Exhibit "A"*.

Mr. Meza-Cervantes was literally being pursued and shot at by members of Mexican organized crime on January 6, 2008. His attackers were relentlessly pursuing him in Mexico, and he was not even safe in the hands of Mexican police because corrupt members of the Tijuana police were cooperating with his assailants. In his fear and confusion on January 6, 2008, Mr. Meza-Cervantes reasonably believed that his only option was to seek safety in the United States. His story has been corroborated by witnesses, including Mr. Meza-Cervantes' sister, Silvia Urbalejo, who has submitted a sworn declaration recounting her knowledge of the Defendant's situation. *See Exhibit "B"*.

**C.     Mr. Meza-Cervantes Reasonably Anticipated That, by Coming to the United States, He Would Be Safe From Murder and/or Severe Bodily Injury.**

Mr. Meza-Cervantes reasonably anticipated that there was a causal relationship between entering the United States and being safe from severe bodily harm and/or death. <u>See</u> <u>Arellano-Rivera</u>, 244 F.3d at 1126. Mr. Meza-Cervantes lived in the United States for over twenty years. He has first-

hand knowledge of the legal system in the United States, and knows that organized crime cannot operate openly in this country with impunity, as they often do in Mexico. Mr. Meza-Cervantes also knows that the vast majority of law enforcement officers in the United States are honest and law abiding, and would not allow him to be attacked, tortured or killed, or be complicit in such acts . Therefore, Mr. Meza-Cervantes reasonably anticipated a causal relationship between entering the United States and securing his personal safety.

**D.      Mr. Meza-Cervantes Did Not Have Any Other Reasonable Legal Alternatives for Entering the United States Without Permission.**

Mr. Meza Cervantes did not have any other reasonable alternatives for entering the United States without permission. See Arellano-Rivera, 244 F.3d at 1126. The necessity defense requires the absence of any legal alternative to the contemplated illegal conduct which could reasonably be expected to abate an imminent evil. See Bailey, 444 U.S. at 410. In Schoon, 971 F.2d at 198, the Ninth Circuit explained that "the law implies a reasonableness requirement in judging whether legal alternatives exist." As an example of reasonableness, the Court noted, "A prisoner fleeing a burning jail, for example, would not be asked to wait in his cell because someone might conceivably save him; such a legal alternative is ill-suited to avoiding death in a fire." Id.

This case is distinguishable from Arellano-Rivera. In Arellano-Rivera, the Ninth Circuit found that a district court properly denied a defendant the right to present a necessity defense, because the defendant failed to show that he had any legal alternatives other than illegally reentering the United States. See 244 F.3d at 1126. Arellano-Rivera suffered from AIDS, and the Ninth Circuit determined that "[p]etitioning the Attorney General for reentry based on an advanced AIDS condition is a viable legal alternative, an alternative Arellano-Rivera never attempted." Id.

Here, petitioning the Attorney General for permission to reenter in order to obtain safety was not a viable legal alternative because Mr. Meza-Cervantes was under an imminent threat of serious bodily injury or death. There is no information in Arellano-Rivera that the defendant was facing imminent death or serious bodily injury, and, thus, Arellano-Rivera could have waited for the Attorney General to review his application and grant his request.

1  Considering the immediacy of Mr. Meza-Cervantes' situation, the fact that he was being
2  shot at and pursued by a criminal gang, applying to the Attorney general for discretionary relief is not a
3  reasonable legal alternative.  Requiring Mr. Meza-Cervantes to apply and wait for permission from the
4  Attorney General is akin to asking "[a] prisoner fleeing a burning jail... to wait in his cell because
5  someone might conceivably save him."  Schoon, 971 F.2d at 198.  Since the Mexican police were
6  cooperating with Mr. Meza-Cervantes' attackers, there were no other reasonable legal alternatives to
7  entering the United States.

### III.

### MOTION FOR LEAVE TO FILE FURTHER MOTIONS

At the time of preparation of these motions, JAIME MEZA-CERVANTES and defense counsel have received limited discovery from the government.  However, the undersigned has been notified that approximately 220 pages of additional discover material are available for pick-up as of May 23, 2008.  As additional information comes to light, the defense may find it necessary to file further motions.  It is, therefore, requested that defense counsel be allowed the opportunity to file further motions based upon information gained through the discovery process.

### CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated: May 27, 2008          /s/ROBERT C. SCHLEIN
                             Robert C. Schlein
                             Attorney-at-Law
                             Attorney for Defendant Meza-Cervantes
                             robert@rcslaw.org